CHICAGO & N. W. R. CO.

v.

CONNOR LUMBER & LAND CO.

No. 11010.

United States Court of Appeals Seventh Circuit.

May 7, 1954.

R. B. Graves, L. L. Chambers, Wisconsin Rapids, Wis., for appellant.

James R. Walker, Norman C. Skogstad, Edward H. Borgelt, Milwaukee, Wis., for appellee.

Before DUFFY, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Summary judgment was entered against the defendant, a shipper, upon plaintiff's motion, for freight undercharges in the sum of $5463.18, plus interest and costs. This appeal by the defendant followed.

714

Defendant, prior to December 31, 1947, shipped logs over plaintiff's line to its mill at Laona, Wisconsin, from points within and without the state, for the purpose of manufacture and reshipment. Under the freight tariff then in effect defendant was privileged to claim the benefit of what are known as transit rates if it agreed to ship the manufactured product over plaintiff's line. It did so agree. Generally speaking, a shipper entitled to a transit rate pays a through rate from the point of original shipment to the final destination, which is less than the total of the local rate from point of original shipment to an intermediate point and the local rate from the intermediate point to the point of final destination. A stoppage of the shipment at an intermediate point will not preclude the application of the through rate where such stoppage is in accordance with a transit privilege granted by the applicable tariff. The privilege of thus stopping a commodity in transit for the purpose of subjecting it to processing and then to further transportation in its altered state, without losing the benefit of the through rate, is termed "milling in transit". However, a transit privilege is not a matter of right; and all conditions and limitations prescribed with reference to it must be observed. 13 C.J.S. Carriers, § 314, p. 732.

At the times hereinafter referred to, the parties hereto were governed by Western Trunk Lines Tariff No. 304–O, as modified by Supplement No. 16, both of which will be hereinafter referred to as the "tariff". The phrase "manufacturing, reshipping, or concentration rates", as used in the tariff, means the same as the phrase "transit rates" as hereinafter used. Pertinent parts of the tariff are:

Item 2. The manufacturing, reshipping or concentration rates referred to herein apply only when the equivalent outbound tonnage is reshipped in carloads or less (sic) carloads via the line of the inbound carrier, at the tariff rates (not switching rates) applying from the station to which the rates subject to these rules, are applied.

In the application of these rules the C. & N. W. and the C. S. P. M. & O. will be considered as a single line.

The tariff rates referred to are those lawfully on file with the Interstate Commerce Commission as to interstate traffic and with the State Commissions as to intrastate traffic.

Item 3–A. Party or parties desiring to avail themselves of manufacturing, reshipping or concentration rates which are subject to this tariff will be required to: (See Note.)

(a) Notify the carrier or its representative in writing of their intention to avail themselves of same.

(b) Keep a complete and accurate record acceptable to the carrier.

(c) Furnish at the close of each month a complete and accurate record of all receipts and dispositions, whether by rail, truck, boat or otherwise. Tonnage received on basis of manufacturing and reshipping rates to be reported separately from that received by truck, boat or otherwise.
* * *

(d) When requested, make statements, and if required, affidavits as to the accuracy of such statements or records.

(e) Permit an authorized representative of the carrier at any time to have access to records and otherwise conform to the carriers requirements as herein provided.

(f) Manufacturing, reshiping, or concentration rates will be denied any shipper who fails or declines to comply with all of these rules.

Note.—Manufacturing, reshipping, or concentration rates will only apply on shipments leaving point of origin on and after date of notification.

**Item 4.** (a) Shipments must be waybilled at the rates applicable when not for storage, drying, concentration, reworking or manufacture, and charges collected on that basis, except as provided in paragraph (b).

(b) When shippers avail themselves of the manufacturing, reshipping or concentration rates thereby agreeing to reship via the inbound carrier commodities as provided in Item 7 manufactured from the equivalent inbound tonnage at rates provided in Item 2 and support this agreement with a bond satisfactory to the inbound carrier, the charges on the inbound shipments will be computed on the basis of the manufacturing, reshipping or concentration rates named in tariffs making reference to this tariff.

**Item 6–C.** Outbound shipments as provided in Item 2 must be made within two years from date of freight bill covering inbound shipment.

If outbound shipments are not made within the time limit prescribed charges will be readjusted as provided in Item 10.

**Item 7.** Credit as provided in Item 10 will be given on the actual weight of outbound commodities consisting of lumber, saw logs, bolts, posts and poles, and on articles manufactured wholly or in part from these commodities, based on percentages of the inbound tonnage determined as provided in Item 9.

Credit will be given in tonnage for material sold to the inbound carrier.

**Item 9.** Shippers shall determine and certify to the Carrier (under oath, if required), subject to verification by the Western Weighing and Inspection Bureau, the actual percentage in weight of articles which they manufacture from their inbound shipment subject to these rules, exclusive of Edgings, Fuelwood (including Cores when used as fuel wood at transit station), Hog Fuel (saw Mill refuse), Sanderdust, Sawdust, Shavings, Slabs, Turnings and Wood-Dust, which shall be considered as waste materials.

**Item 10–A.** (a) Carrier's Agents at receiving stations shall furnish the Western Weighing and Inspection Bureau, statement or copies of all freight bills covering inbound shipments of lumber, logs, and other forest products consigned to party or parties availing themselves of these rules, and shall also furnish statement or copies of billing covering all outbound commodities.

(b) The Western Weighing and Inspection Bureau will keep a debit and credit account based on actual weights of inbound and outbound shipments with each party or parties availing themselves of these rules cancelling the old-

est inbound tonnage matched against the outbound tonnage according to percentages determined under Item 9, and shall render bills to such party or parties for any undercharges due to Carriers on account of failure to comply with these rules.

(c) Carriers will require, annually, as of June 30th or December 31st and at such other times as they may deem it necessary, an accounting of tonnage (on hand at yard or mill of transit operators, from which reshipment of inbound tonnage received on basis of manufacture and reshipment rates is made) and cancellation of excess inbound billings as may appear necessary to properly apply lawful rates. If at any time during the time limit period the transit operator does not have sufficient tonnage (on hand at yard or mill of transit operator from which reshipment of inbound tonnage received on basis of manufacture and reshipment rates is made) to cover tonnage due inbound carrier, adjustment will be required and undercharges collected as provided in paragraph (b).

(d) When inbound shipments are handled in accordance with paragraph (a) of Item 4, charges on inbound shipments will be re-adjusted by the Western Weighing and Inspection Bureau to a basis of manufacturing, reshipping or concentration rate in effect on date of shipment from point of origin when matched against the outbound billing on basis of the percentages determined under Item 9.

The Western Weighing and Inspection Bureau will be hereinafter referred to as the "bureau", and the percentage referred to in item 9 will be referred to as the "product equivalent".

It appears that defendant failed to make outbound shipments over plaintiff's line of sufficient tonnage, after applying the proper product equivalent, to equal at all times, when added to the material on hand, the tonnage of in-bound shipments. All logs in in-bound shipments were waybilled at and originally paid for on the basis of transit as distinguished from higher non-transit rates. All logs so transported were treated as fungible goods, in that they were not segregated during the process of manufacture and reshipment. On May 24, 1948, the bureau commenced its audit of the defendant's books, pursuant to the tariff, for the accounting period ending December 31, 1947. The defendant having failed to determine and certify to the carrier its product equivalent as required under item 9, the bureau itself ascertained that factor on August 15, 1949, the accuracy of which has not been challenged by defendant. Prior to the commencement of said audit the defendant never asserted that any of the shipments involved herein should move, or had been moved, at non-transit, rather than transit, rates. Such assertion was first made as to some shipments on December 28, 1948, and as to the balance thereof in January, 1949, at which times the bureau's preliminary accounting work indicated that a substantial tonnage deficit would appear in the defendant's account upon completion thereof.

Defendant rendered statements on December 28, 1948, and in January, 1949, of various in-bound shipments which it purported to elect to pay on the basis of non-transit rates, and then paid to the plaintiff the difference between the transit rates on such shipments, paid at the time of delivery, and the applicable non-transit rates. This payment was $6848.-64, including federal tax. It was accepted and retained by plaintiff.

The bureau, having determined the product equivalent to be 26.1% on August 15, 1949, did make an audit of defendant's tonnage deficit based thereon, a copy of which appears in the record. The date of completion of the entire audit, showing the amount due from defendant for undercharges, and the date when bills, if any, were rendered to defendant therefor, do not appear in the record. The completion of the audit and the sending of the bills could not have occurred before August 15, 1949, when the product equivalent was determined. They may have occurred later.

The audit of defendant's tonnage deficit, as developed by the bureau, showed a tonnage deficit as of December 12, 1947, after adjustment by application of the product equivalent, of 29,976,073 lbs. To make up for this deficit, the bureau canceled the oldest in-bound tonnage by matching it against equivalent out-bound tonnage, and then applied non-transit rates to the uncanceled in-bound shipments amounting to 29,976,073 lbs. This resulted in a deficit in freight rate payments of $12,152.70. Crediting this with the aforesaid payment of $6848.64, a balance remained of $5304.06, which, with a federal tax thereon of $159.12, resulted in a total amount due of $5463.18.

■ 1. It appears that, as to all in-bound shipments involved herein, defendant originally desired to and did avail itself of the transit rates plan set up by the aforesaid tariff. It thereby became obligated, in order to obtain the concession of such lower through rates, to comply with every pertinent provision of the tariff imposing duties upon it as a shipper. It could not accept the benefits of the program without discharging the burdens thereof. Defendant is prevented by the inherent as well as the expressed purposes of the tariff from ignoring its provision requiring the extinguishment of freight liability on in-bound shipments only in their chronological order.

■ Admittedly defendant's selection of certain in-bound shipments for payment of non-transit rates thereon without regard to the chronological order of such shipments would be to its financial benefit. It contends that it had the right to make that selection, urging that there is no provision in the tariff forbidding a shipper electing, at any time before claim is made by the carrier for undercharges, to pay the applicable local rates on any or all of the in-bound shipments. While there is no express language in the tariff to that effect, the principle upon which the transit rate tariff is based does not permit of such selection by a shipper of any in-bound shipments already transported under the transit tariff. Having elected to operate under that tariff as to particular in-bound shipments, he is required to comply with that tariff until all of his obligations thereunder as to such in-bound shipments have been fully satisfied. Even if he makes payment of non-transit rates on selected in-bound shipments, thus attempting to free them from the tariff provisions, and the carrier actually accepts the payments under those circumstances, there is no effectual waiver. To the extent that the shipper gains a financial advantage by his attempted action, an unlawful preference results, injurious not only to the carrier but to other shippers. The carrier cannot waive the rights of other shippers. The determination as to what in-bound shipments were to be subject to the transit tariff was to be made by defendant when such shipments were made. Under item 4(a) of the tariff the defendant could have had the shipments waybilled at non-transit rates, but it elected at the time of said shipments to avail itself of the provisions of item 4(b) and thereby irrevocably impressed the in-bound shipments with the transit rate provisions of the tariff.

The bureau properly applied the out-bound shipments and tonnage on hand against the in-bound shipments in chron-

ological order of the latter, as required by item 10–A(b) and (c).

We, therefore, conclude that the defendant became liable to the plaintiff in the amount of $5304.06, plus a federal tax thereon of $159.12, or a total of $5463.18, plus interest.

 2. Defendant strongly contends, however, that when this suit was filed by plaintiff the claim of the plaintiff was barred by the statute of limitations.

The applicable limitation is prescribed by the Interstate Commerce Act, U.S.C. A., Title 49, § 16(3). So far as material, it reads as follows:

"Limitation of actions

"(3) (a) All actions at law by carriers subject to this chapter for recovery of their charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after.

\* \* \* \* \* \*

"(e) The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after".

From the face of the statute it would seem that claims for freight charges for shipments which were delivered during the year 1947 are automatically barred since suit was not commenced until May 1, 1950. It is fairly well established, however, that such is not the case where a transit operation is involved. Neither do we understand that the defendant now contends that the statute commenced to run as of the date of delivery of each individual in-bound shipment; rather, it asserts that under the terms of the tariff its liability became fixed and the statute commenced to run when it first had on hand an insufficient quantity of raw material and finished products to permit it to manufacture and thereafter reship a sufficient quantity of out-bound tonnage to equal the in-bound tonnage.

Plaintiff contends that the statute of limitations commenced to run only when a determination could be made as to which rates were applicable to each of the shipments involved; and that the limitations issue is thus essentially a matter of deciding when defendant's liability for additional freight charges first became determinable under the terms of the tariff.

Under item 9 of the tariff it was the duty of the defendant to determine and certify to the plaintiff the product equivalent. This it failed to do. That factor was not determined until August 15, 1949, when it was ascertained by the bureau. Thereupon for the first time the bureau was in a position to make an adjustment as required by item 10–A, upon which the amount owing by the defendant could be ascertained and payment required. Assuming that the adjustment, the computation of amount due from defendant, and a demand for payment could have all been made on August 15, 1949, it was then for the first time that defendant could have been sued for the collection of the amount found due. Defendant cannot be heard to say that the cause of action accrued when it failed to have in inventory logs or products manufactured therefrom sufficient to equal the difference in tonnage of logs shipped in and the product therefrom shipped out. Regardless of when this deficit actually occurred, the fact thereof and its extent could not be ascertained until the product equivalent was first determined. It was primarily the duty of the defendant to determine and certify that factor to the carrier under item 9. If the determination of that factor was delayed through the fault of the defendant to make and certify that factor under item 9, the defendant cannot be heard to say that the statute of limitations was running during the period of that delay. Certainly the plaintiff could not have sued the defendant before the adjustment was made by the bureau showing whether or not there was a deficit imposing upon defendant an obligation to pay non-

transit rates, and, if so, the amount thereof.

While we are not concerned with the wisdom of the tariff provisions on this subject, it is apparent that the reason for the imposition upon a shipper of the duty to determine and certify to the carrier the actual percentage in weight of the waste materials resulting from the manufacture of raw material is reasonable in view of the fact that that is a matter peculiarly within the knowledge of the shipper who conducts the manufacturing operation.

The cause of action referred to in Sec. 16(3) (e), supra, does not apply to a case arising under a transit tariff. Arkansas Oak Flooring Co. v. Louisiana and Arkansas Ry. Co., 5 Cir., 166 F.2d 98. In the cited case it appeared that the tariff provided that there was to be a reshipment of the finished lumber within one year after its in-bound delivery to the shipper, and it was held that the statute of limitations of two years did not bar a suit for the local rate on rough lumber received by the shipper and not reshipped within one year, where the suit was brought within two years after the expiration of the one-year period. The expiration of the year in that case was the event which caused the statute of limitations to commence running.

Viewing the facts in the case at bar in the light most favorable to defendant, the date upon which the product equivalent was ascertained was the earliest possible date upon which the statute of limitations could have started running. That event took place on August 15, 1949, and the instant case was started on May 1, 1950.

The defense of the statute of limitations is not sustainable.

The District Court properly allowed interest on the claim from August 15, 1949.

The judgment of the District Court is affirmed.

Affirmed.