George P. BAKER et al., Plaintiffs,

v.

CHAMBERLAIN MANUFACTURING CORPORATION, a corporation, Defendant.

No. 72 C 1364.

United States District Court,
N. D. Illinois, E. D.

Jan. 19, 1973.

Robert H. Bierma, Richard O. Olson, Paul G. Velbergs, Chicago, Ill., for plaintiffs.

Bryce L. Hamilton, Winston & Strawn, Richard J. Brennan, Chicago, Ill., for defendant.

MAROVITZ, District Judge.

### MEMORANDUM OPINION

*Motion For Summary Judgment*

This action was filed on May 31, 1972 on behalf of plaintiff Penn Central for recovery of demurrage charges in the amount of $18,925 allegedly accrued on interstate carload shipments delivered by plaintiff to defendant at its plant in New Bedford, Mass., during April and May of 1969. The precise dates of those deliveries and the date this action was filed are critical as will subsequently become evident.

Defendant has filed a Motion For Summary Judgment on the grounds that the action was not brought within three years from the delivery of the shipments for which demurrage is claimed as is required by Section 16(3)(a) and (e) of the Interstate Commerce Act, 49 U.S.C. § 16(3)(a) and (e).

The Interstate Commerce Act provides that:

> "(a) All actions at law by carriers subject to this part for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after."

. . . . . .

> "(e) The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or ten-

der of delivery thereof by the carrier, and not after."

■ We have no difficulty with the proposition that the word "charges" in § 16(3)(a) includes the recovery of demurrage charges for excess detention of cars. Thus if this were an instance where the parties utilized a straight demurrage plan whereby the shipper becomes liable for, and the carrier has a right to collect demurrage charges immediately upon the delivery of the car incurring demurrage we would have no difficulty in finding for defendant. The parties have stipulated that the shipments were delivered by plaintiff on various dates in April and May of 1969 and that all cars in issue were unloaded by defendant on various dates between May 1st, and May 27, 1969, the last shipment in issue having been delivered on May 23, 1969 and the last car released on May 27, 1969.

Hence the suit having been filed on May 31, 1972 would have clearly been brought after the § 16(3)(a) three year limit.

Matters are, however, complicated in this case by the parties' use of Rule 9 of Freight Tariff 4–I, Interstate Commerce Commission No. H–36, known as the "Monthly Average Demurrage" whereby demurrage payments are allowed to be made on a monthly basis.

Rule 9 provides:

"When a written agreement as follows (See Section 1) has been entered into the charge for the detention of cars, on all cars subject to demurrage, except as otherwise provided in Section E, held for loading, shall be computed on the basis of the average time of detention to all such cars released during each calendar month . . .

"SECTION A. One credit will be allowed for each car released before the expiration of the first twenty-four (24) hours of free time. After the expiration of forty-eight (48) hours free time (or the adjusted free time provided in Rule 8, Section A, Paragraph 2, page 65) one debit per car

per day or fraction of a day, will be charged for each of the first four days.

"SECTION D. At end of the calendar month the total number of applicable credits will be deducted from the total number of debits and $5.00 per debit will be charged for the remainder. If the credits equal or exceed the debits no charge will be made for the detention of the cars except as otherwise provided in Section A for detention beyond the fourth debit day, and no payment will be made by this railroad on account of such excess of credits; nor shall the credits in excess of the debits of any one month be considered in computing the average detention for another month."

Thus credits earned on cars released prior to the expiration of the tariff free time during a calendar month may be used on the last day of that month to offset debits incurred on cars released after the expiration of tariff free time during the same calendar month.

Plaintiff argues that when the "Monthly Average Demurrage Plan" is being used the § 16(3)(a) three year statute of limitations begins to run from the last day of the month in question and not from the time of delivery as required by § 16(3)(e).

The last day of the month during which the demurrage charges were incurred in our case was May 31, 1969 and plaintiff therefore contends that the suit having been filed on May 31, 1972 was brought within the three year period. Plaintiff's reasoning is that unlike cases where the "Straight Demurrage Plan" is being used and the demurrage is due upon delivery, the demurrage in "Monthly Average Plan" situations does not accrue upon delivery but rather on the last day of the month and that the statute of limitations ought to run from that day since that is the point in time when the charges accrue or become determinable and collectible.

Defendant, on the other hand, argues that § 16(3)(e) is explicit and binding

in terms of when the statute of limitations begins to run, i. e. that "The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after." Consequently, defendant contends, irrespective of whether the "Straight Demurrage" or "Monthly Average" plan is being used the statute of limitations begins to run on the *date of delivery*. In our case the last car in the month of May, 1969 was delivered on May 23, 1969 and released on May 27, 1969 and the statute of limitations, defendant asserts began to run on the date of delivery, and the suit having been brought on May 31, 1972 was at least a week beyond the three year limit on the last car and even longer on cars delivered earlier in the month.

Simply stated then the issue we are being asked to resolve is at what point does the § 16(3)(a) three year statute of limitations for recovery of charges begin to run in instances where a "Monthly Average Demurrage Plan" is being used—on the date of delivery as required by § 16(3)(e) or on the last day of the month when the charges are computed.

As far as we can determine no Court has spoken on this precise issue though both plaintiff and defendant suggest various cases in support of their position as being analogous and therefore dispositive of the issue in this case.

We begin with the proposition that the policy behind § 16, as indeed is the policy underlying the entire Interstate Commerce Act, is to attain uniformity in the dealings between carriers and shippers and to prevent discrimination as the Court in Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96 (1943), a case dealing with an agreement between the carrier and shipper extending the § 16(3)(a) statute of limitations, stated:

. . . Section 16 expresses the specific policy of the Act with reference to the assertion of stale claims. On the section's face, this policy is one of uniformity and equality of treatment, as between carrier and shipper. (at 361, 64 S.Ct. at 131)

The uniformity sought by the promulgation of the § 16(3)(a) three year statute of limitations is further buttressed by the elimination of any doubt as to when that three year period begins to run. Recognizing that a multitude of variations in terms of when the three year period would begin to run would result if conventional standards of accrual for transportation charges were utilized, Congress established a uniform time in the shipping process, for the purposes of this section, as a precise statutory point in time for the three year limitations to begin running, that point being the delivery time. Thus it would appear that the general notion of statutes of limitation which treats the beginning of such limitation period as being the time when the judicially enforceable cause of action accrues, i. e. when the suit can be brought, is discarded in favor of the § 16(3)(e) uniform statutory period of delivery as the start of the limitation period.

In order to determine whether or not users of the "Monthly Average Demurrage Plan" ought to be exempt from this stringent rule we must consult several cases which have generally dealt with the scope of § 16(3)(a) and (e).

In Pennsylvania R. Co. v. Carolina Portland Cement Co., 16 F.2d 760 (4th Cir. 1927) the consignee refused to accept delivery of a shipment of lumber, the carrier subsequently sold the shipment for the charges and sued the consignor for the difference between the charges and what the sale brought. The suit was brought more than three years after delivery but less than three years after the sale. The Court held:

"We think that the clear meaning of this statute is that actions by carriers to recover charges made with respect to a shipment of goods must be commenced within three years after deliv-

ery is made or tendered, even though a part of the charges sought to be recovered be for services rendered after tender of delivery. The language of the statute is clear, and does not require that we resort to any rules of construction or interpretation to ascertain its meaning. Its manifest purpose was to fix one date on which all causes of action, both those in favor of shipper and those in favor of carrier, with respect to any particular shipment, should be deemed to have accrued, so that, in the application of the section limiting time for suit, a situation would not arise wherein claims in favor of one party arising out of a particular shipment would be barred and those in favor of the other party not be barred. This purpose clearly appears from the sentence which extends the two-year period of limitation for recovery of damages by the shipper in cases where the carrier begins action for recovery of charges after the two-year period." (at 761)

Similarly, in Chesapeake & O. Ry. Co. v. Wiener, 336 Mich. 548, 58 N.W.2d 918 (1953) the Michigan Supreme Court held that the statute of limitations for recovery of demurrage charges begins to run at the time of delivery. The Court discounted appellant's reliance on certain interstate commerce regulations in regard to computing time for demurrage charges stating:

> "The plain answer is that the 2-year period has been fixed by act of Congress, and it has not been left open to interstate commerce regulations promulgated for the purpose of computing the time for determining demurrage charges. *Computing demurrage charges is one thing in that it fixes the amount of the charge and is quite apart from determining the time within which an action to collect such charges may be commenced, which has been fixed by statute.* (Emphasis added.) (at 919–920).

(See also Wisconsin Bridge & Iron Co. v. Illinois Terminal Co., 88 F.2d 459 at 462 (7th Cir. 1937) holding that "events occurring subsequent to the delivery may not be relied upon to extend the period within which the suit must be brought" under § 16(3)(e).)

It is therefore evident that the § 16(3)(e) provision setting the delivery date as the start of the three year period of limitation cannot be modified by private contract or even by an Interstate Commerce regulation and that it begins to run from the time of delivery irrespective of what occurred or what was incurred subsequent to delivery.

Plaintiff however cites several cases in support of its position and distinguishes *Wiener* and *Portland Cement, supra* on the grounds that those cases did not involve a "Monthly Average Demurrage" plan.

Plaintiff places heavy reliance on Arkansas Oak Flooring Co. v. Louisiana & Arkansas Ry. Co., 166 F.2d 98 (5th Cir. 1948) wherein the defendant shipper obtained the benefits of a lower rough material tariff by agreeing to reship the rough goods it received in a finished form within one year. Ordinarily a higher local tariff would have been applicable. When defendant failed to reship within one year the plaintiff railroad brought an action to recover the higher rate. The action was brought more than two years after delivery, the § 16(3)(a) limitation being two years at that time. The Court held that the action was not barred by § 16(3)(a) and (e) stating:

> "As pointed out in the *Midstate* [Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96] case, the prime purpose of the statute, in fixing the same period after their accrual for suing on all actions, was to secure uniformity and to prevent discrimination. Full effect can be given this purpose if it is held that delivery by the carrier accrues the cause of action on all shipments under a tariff where the rate is unalterably fixed. Where, however, as here, the transit rate, the only collectible rate at the time of delivery, was, under the tariff subject to

change within the year, the cause of action for the local rate cannot be said to have accrued at the time of the delivery but one year thereafter." (at p. 101).

Plaintiff argues that our case is identical in that just as the cause of action in *Arkansas Oak* did not begin to run until the end of the year when the rate was determinable, inalterably fixed and the cause of action had accrued, so in this action the rate did not become determinable and fixed until the last day of the month, May 31, 1969 and that consequently the action was brought within three years.

We find *Arkansas Oak* distinguishable in theory and fact and therefore find it of no precedential value. What must first be understood is that *Arkansas Oak* is a "transit" case which presents a unique set of circumstances not readily analogous to demurrage cases.

The Court in Chicago & N. W. R. Co. v. Connor Lumber & Land Co., 212 F.2d 712 (7th Cir. 1954) recognized this distinction when it stated:

> From the face of the statute it would seem that claims for freight charges for shipments which were delivered during the year 1947 are automatically barred since suit was not commenced until May 1, 1950. It is fairly well established, however, that such is not the case where a *transit operation* is involved . . .
>
> The cause of action referred to in Sec. 16(3)(e), supra, does not apply to a case arising under a *transit tariff*. Arkansas Oak Flooring Co. v. Louisiana and Arkansas Ry. Co., 5 Cir., 166 F.2d 98 (emphasis added). 212 F.2d at 718–719.

Indeed "transit" cases require the reshipment of the goods in an improved form as a *condition precedent* to the use of a more beneficial tariff and perforce involves a greater amount of time in order to determine whether the improvement process has been complied with. In *Arkansas Oak* that time was one year and quite understandably it would have been inequitable to have the period of limitations run from the time of delivery rather than the time the finished product was to have been shipped.

Thus we find a critical distinction between the substantive indeterminateness of transit cases such as *Arkansas Oak* and computational indeterminateness such as in our case, the former being factual while the latter is volitional by agreement of the parties.

In *Arkansas Oak* the applicable *rate* structure was wholly dependant upon compliance with the condition precedent to reship in an improved form within one year and consequently the rate in effect was factually and substantively indeterminable until the end of the conditional year and the rate could be considered not to have accrued until all conditions precedent were met with.

In our case, however, the rate was constant and inalterable and hence irrevocable, the only limitation being a procedural condition subsequent that the debits and credits be balanced on the last day of the month. The indeterminateness prior to the last day of the month therefore was not a factual or substantive one but rather a computational one. The amount owed in our situation accrued and was perfectly determinable on a factual level at any given point in the month in question and indefiniteness resulted only from the agreement between the parties to defer computation for any given day until the last day of the month. The fact that credits earned by early release of cars can offset debits goes to computational rather than factual indeterminateness since either party could if it wanted to subtract the credits, if any, from the debits on any given day of the month and factually determine what amount was owed at that juncture.

Hence there is a crucial difference between an "indeterminable amount" and an "amount not determined", the former being intrinsically factual while the latter is extrinsic to the facts and "not determined by agree-

ment of the parties". While it is *conceivable* that the § 16(3)(a) 3-year statute of limitations does not begin to run in cases of factual indeterminateness such as *Arkansas Oak* until the point of *actual* determination, it is clear in cases of computational indefiniteness such as ours that the § 16(3)(e) point of delivery is binding. This is precisely what the Court in Chesapeake & O. Ry. v. Wiener, *supra*, meant when it stated that "computing demurrage charges is one thing in that it fixes the amount of the charge and is quite apart from determining the time within which an action to collect such charges may be commenced, which has been fixed by statute." (58 N.W.2d at 919–920)

While this theoretical distinction in its objective application renders *Arkansas Oak* precedentially irrelevant to our case that distinction becomes all the more fatal to plaintiff's analogy when applied on a subjective level to the facts in our case.

Plaintiff compares the last day of the year in *Arkansas Oak* to the last day of the month in our case in that in both cases the amount owed was determined at that point and posits that the statute of limitations ought to begin running in our case from the day of determination as it did in *Arkansas Oak*. If indeed the amount owed in our case had been in flux until May 31, 1969, the last day of the month in issue, due to debits or credits incurred on May 31, 1969 the analogy would have been more appropriate—though certainly not dispositive— since the amount owed indeed would not have been determined until a point in time analogous to the last day of the year in *Arkansas Oak*.

■ The specific facts in our case, however, indicate that the last car was delivered on May 23, 1969 and released on May 27, 1969, with no debit or credit accruing between May 27th and May 31, 1969. Hence on May 27th the amount owed for the month of May was factually determinable. Thus even if we were to concede—which we do not—that the

factual possibility of an *interim* computation does not alleviate indeterminateness where that interim amount is modified by subsequent events which keep the amount in flux until the last day of the month, we would nevertheless be compelled to hold in this case that no indeterminateness existed on that last day of the month since matters were factually settled on May 27th several days before the end of the month. The amount owed on May 27th was, therefore, not an interim amount but the full and final amount and the deferral of the computation is extrinsic to the fact.

The analogy to *Arkansas Oak*, then, would have been appropriate only if the defendant in that case had refused to improve the lumber at a point *during* the conditional year, e. g. after six months, and the Court had nevertheless held that the statute of limitations did not begin to run until the end of the conditional year, a holding which would obviously have been illogical.

The *Arkansas Oak* genre of exception from § 16(3)(a) and ˊ(e) is therefore on a subjective and objective level inapplicable to our case. (We are in no way intimating with the foregoing analysis that in Monthly Average Demurrage cases that the statute of limitations begins to run from the time the amount owed was factually determinable. We are merely stating that the indeterminateness in Monthly Average Demurrage cases is not of the same genre as transit cases such as *Arkansas Oak* and that § 16(z)(e) is therefore binding.)

■ Plaintiffs' major error lies in its misconstruing of the terms "accrue" and "come due" at least for the purposes of § 16(3)(e). The statute is explicit that accrual under § 16(3)(e) is not synonymous or mutually interchangeable with collectability or dueness of the debt and that the point of delivery overrides any conventional notion of when an action judicially matures. Indeed if the statute had meant to adhere to the general standards of allowing the statute of limitations to run from the point when

the action could have been brought then § 16(3)(e) would have been totally superfluous. It is therefore clear that Congress anticipated the multitude of variations in periods of limitations that would result if conventional standards of triggering the period were used and promulgated § 16(3)(a) and (e) in order to avoid such variation by creating a uniform time of accrual irrespective of when the action could have generally been brought.

The fallacy in plaintiffs' reasoning becomes all the more clear when the "Monthly Average Demurrage Plan" is compared to the "Straight Demurrage Plan". If we were to adopt plaintiffs' reasoning that where the amount owed is indefinite the case does not fall within the requirements of § 16(3)(e), then § 16(3)(e) would not apply to Straight Demurrage cases either since the *amount* owed is determined at the time of the release of the cars and not at the point of delivery and remains indefinite well past the delivery point. Yet plaintiff seems to concede that the statute of limitations begins to run at the time of delivery in Straight Demurrage cases. Quite obviously, then, the indefiniteness in the amount owed at delivery in Straight Demurrage cases due to ignorance as to when the cars will be released is no different from the indefiniteness in the amount owed at delivery in Monthly Average Demurrage cases where that ignorance is due to the allowance of offsets and an agreement to defer computation until the end of the month. In both instances § 16(3)(e) is equally as applicable.

Finally, we find nothing inequitable or prejudicial to carriers in the statute of limitations running from the time of delivery rather than from the last day of the month. If this were an instance where the statute of limitations was sixty days or ninety days there would be a critical difference in whether the time begins to run at delivery or on the last day of the month, the difference between the two points conceivably being as much as 30 days. But the statute of limitations in our case is three years and the fact that we find that the period begins to run from delivery in Monthly Average demurrage cases rather than from the last day of the month is an insignificant limitation given the vast amount of time available for bringing suit.

We therefore hold that where a "Monthly Average Demurrage Plan" is used the § 16(3)(a) 3-year statute of limitations begins to run from the time of delivery as indicated in § 16(3)(e) and not from the last day of the month. Plaintiffs' suit brought on May 31, 1972 more than three years after the last delivery is therefore barred by the statute of limitations and the defendant's Motion For Summary Judgment is granted.