**ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**The Association of American Railroads, Pielet Brothers Scrap Iron & Metal Inc., Pielet Brothers Trading Corp., Intervenors.**

**No. 87-1417.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1988.

Decided July 8, 1988.

J. Michael Hemmer, with whom Robert D. Fram, J. Thomas Tidd, Kenneth P. Kolson, Robert B. Batchelder, Washington, D.C., Larry D. Starns, Fred R. Birkholz, James L. Howe, III, Roanoke, Va., Robert T. Opal, Guy Vitello, Chicago, Ill., and John S. Walker, Denver, Colo., were on the brief, for petitioners and intervenor, Ass'n of American Railroads. Michael Boudin, Washington, D.C., also entered an appearance for intervenor, Ass'n of American Railroads.

Craig M. Keats, Deputy Associate General Counsel, Cecelia E. Higgins, Atty. I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the joint brief for respondents, I.C.C. and United States of America.

Stephen D. Strauss, Cincinnati, Ohio, and Stephen C. Herman, Chicago, Ill., were on the joint brief of intervenors, Pielet Brothers Scrap Iron & Metal, Inc. and Pielet Brothers Trading Corp.

Before WALD, Chief Judge, ROBINSON and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Section 204(e) of the Staggers Rail Act of 1980 (Act), codified at 49 U.S.C.App.

§ 10731(e) (1982), caps the rate a rail carrier may charge shippers for transport of nonferrous recycled or recyclable materials. Shippers who have paid rates exceeding the ceiling may file complaints with the Interstate Commerce Commission (ICC or Commission) for refunds under 49 U.S.C. § 11705(b) of the Act. Petitioning railroads and intervenor Association of American Railroads seek review of the time dimension of an ICC order granting rate refunds to Pielet Brothers Scrap Iron & Metal, Inc. (Pielet), a shipper of a type of nonferrous recyclable known as automobile shredder residue (ASR). The Commission's order allowed all refunds Pielet claimed, covering shipments delivered between January 21, 1981 and the date of Pielet's complaint, June 29, 1984. *Pielet Bros. Scrap Iron & Metal, Inc. v. Atchison, T. & S.F. Ry.*, No. 39814 (I.C.C. June 16, 1987).

Petitioners maintain that 49 U.S.C. § 11706(c)(1) imposes a two year statute of limitations on refunds of the type Pielet seeks and that, pursuant to 49 U.S.C. § 11706(g), claims for such refunds accrue on the shipment's delivery or tender of delivery by the carrier. Therefore, they urge, the ICC erred in ordering refunds for shipments delivered before June 29, 1982. The ICC and Pielet, asserting widespread confusion among shippers concerning the right to receive refunds for ASR transport, contend that Pielet's claims did not accrue upon delivery of the shipments, but only upon final clarification by the Commission, in July 1986, of the ASR shippers' refund entitlement.

We grant the petition for review and reverse the decision of the ICC so far as it relates to the time Pielet's claims accrued. Pursuant to 49 U.S.C. § 11706(g), we hold, Pielet's claims against the railroads accrued upon delivery of the ASR shipments. We remand the dispute to the Commission so that it may determine definitively the length of the prescription period, in view of Pielet's alternate contentions that either no fixed time bar applies at all, or three years, not two, is the applicable limitation.

## I.

To implement section 204(e), the ICC ordered both (1) instanter rate reductions for the rail transport of nonferrous recyclables, and (2) refunds to shippers who paid rates, after January 1, 1981, exceeding the section 204(e) ceiling. *See National Ass'n of Recycling Indus., Inc. v. ICC*, 660 F.2d 795 (D.C.Cir.1981) (*NARI III*) (instructing ICC to institute immediate reductions); *Cost Ratio for Recyclables—1980 Determination*, 365 I.C.C. 304 (1981) (*1981 Decision*) (ordering reductions and refunds), *aff'd mem. sub nom. Baltimore & O.R.R. v. ICC*, 684 F.2d 1031 (D.C.Cir.1982) (unpublished). In line with this court's suggestion in *NARI III*, 660 F.2d at 799, the Commission's *1981 Decision* occasioned the setting of rate reductions and attendant refunds on the basis of territorial averages for each class of recyclables in a specified geographic area. Inevitably, use of an averaging method yielded some individual rates above, and others below, the statutory ceiling.

Beginning in 1981, shippers whose territorial average-based refunds left their individual rates still above the section 204(e) ceiling complained to the ICC; the complainants sought additional reductions and refunds for those above-ceiling rates. Over the railroads' opposition, the Commission accepted such complaints and ordered additional, individualized reductions and refunds. *See Cost Ratio for Recyclables— 1980 Determination*, 367 I.C.C. 623 (1983) (*1983 Decision*). In *Norfolk & W. Ry. v. United States*, 768 F.2d 373 (D.C.Cir.1985), *cert. denied*, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986), in response to the railroads' petition for this court's review, we reversed the Commission's *1983 Decision* "to the extent that it authorize[d] reductions or refunds with respect to rates already in compliance with section 204(e) on a territorial average basis," *id.* at 381; shippers who received territorial average rate reductions, we held, were not entitled, in addition, to individualized rate reductions.

*Norfolk & Western* did not address the case of rates above the statutory ceiling

that had not been adjusted under the territorial average method. ASR shipments fall in that category. ASR was not among the classes of recyclables subjected to territorial averaging by the 1981 reductions, apparently for want of a revenue and cost data base sufficient to permit such averaging. *Norfolk & Western*'s injunction against dual reductions, therefore, had no bearing on ASR shippers. Over the objection of the railroads, the ICC held as much in *Newell Recycling Enters., Inc. v. Norfolk S. Corp.*, No. 39647 (I.C.C. July 2, 1986) (*Newell–Reopening*). Thus, after five years of litigation skirmishes among shippers, rail carriers, and the ICC, ASR shippers remained where they were in 1981: able to file individual rate reduction and refund claims with the ICC against rail carriers charging rates above the section 204(e) ceiling.

Pielet filed its individual rate reduction and refund claims on June 29, 1984 based on shipments delivered as far back as January 21, 1981. In defense to Pielet's complaint, the railroads pleaded, *inter alia,* that the 49 U.S.C. § 11706(c)(1) two year statute of limitations barred Pielet's rate claims for shipments delivered before June 29, 1982. Pielet persuaded the Administrative Law Judge (ALJ) that section 204(e) claims either carried no fixed statute of limitations at all or, pursuant to 49 U.S.C. § 11706(b), had a three year limitation period. *Pielet Bros. Scrap Iron & Metal, Inc. v. Atchison, T. & S.F. Ry.*, No. 39814 (I.C.C. Mar. 27, 1985) (ALJ decision).

On appeal, the Commission affirmed the ALJ's decision that none of Pielet's claims were time-barred, but on different grounds. Relying on its reasoning in *Newell Enters., Inc. v. Atchison, T. & S.F. Ry.*, No. 39669 (I.C.C. May 11, 1987) (*Newell I*), the Commission declared that it was "unclear" prior to the *Newell–Reopening* decision "whether individual ASR rate complaints could be filed," and therefore "Pielet's right to file its complaint ... did not fully mature on the dates of delivery of its shipments, but on the date we announced that such complaints may be filed, which was the July 10, 1986 service date of the decision in *Newell*[*–Reopening* ]." *Pielet*

*Bros. Scrap Iron & Metal, Inc. v. Atchison, T. & S.F. Ry.*, No. 39814, slip op. at 3 (I.C.C. June 16, 1987). The Commission thus determined that Pielet's claims accrued over two years *after* they were filed. Having so decreed the full vitality of Pielet's complaint, the Commission might have said no more. Instead, however, the ICC simultaneously announced that the ALJ had erred in his statute of limitations determination: ASR rate complaints based on section 204(e) of the Staggers Act, the ICC said, are subject, under 49 U.S.C. § 11706(c)(1), to a two year statute of limitations running from the date the claim accrues.

Petitioners timely sought review of the Commission's decision in this court. After the briefing schedule was set, Pielet, as intervenor, sought leave to raise this separate but related issue: what statute of limitations, if any, applies from the date of accrual. We denied Pielet's motion as interjecting an issue not yet ripe for review. *Atchison, T. & S.F. Ry. v. ICC*, No. 87–1417 (D.C.Cir. Feb. 18, 1988) (order denying motion to raise separate but related issue). Both briefing and oral argument, therefore focused exclusively on the date of accrual issue. We now vacate the ICC's order and remand the case. All ASR rate claims accrue, we hold, on the date shipments are delivered or delivery is tendered. On remand, the Commission will be positioned to rule definitively on the question raised by Pielet's motion. Although the Commission addressed that question earlier, its ruling was not then necessary to, and did not advance, its decision. Accordingly, all participants to this proceeding should be accorded a renewed opportunity to consider whether any statute of limitations restricts Pielet's claims and, if one does, whether the limitation period is three years or two.

## II.

If ASR rate complaints based on section 204(e) of the Act are subject to any fixed time limitation, the choice of limitations is circumscribed: Pielet urges the three year prescription stated in 49 U.S.C.App. § 11706(b); the railroads urge the two year

period stated in 49 U.S.C. § 11706(c)(1).[1] Both sections provide that complaints must be filed within the specified period "after the claim accrues." In this instance, Congress deliberately did not leave the definition of accrual to judicial or administrative elaboration. Section 11706(g) specifically prescribes: "A claim related to a shipment of property accrues under this section on delivery or tender of delivery by the carrier."

As just recounted, the ICC set July 10, 1986, the date its *Newell–Reopening* decision was served, as the accrual date for all ASR rate complaints based on shipments delivered up to that time. The plain language of subsection 11706(g) rules out such a construction, petitioners say. They urge that "delivery or tender of delivery" means, and was intended to mean, just that; there is no ambiguity; Congress resolved the matter expressly and purposefully, as recounted in *Baker v. Chamberlain Mfg. Corp.*, 356 F.Supp. 1314, 1317, 1320–21 (N.D.Ill.1973).

The Commission presented no exposition of its position in this case; its decision simply refers back to its resolution of the same issue in *Newell I.* There, the Commission pointed to a series of decisions recognizing an exception to, or qualification of, subsection 11706(g) (or its predecessor, 49 U.S.C.App. § 16(3)(e)) for "transit tariffs"—unusual, although recurring, situations in which the tariff rate applicable to a shipment can be ascertained only after completion of the second leg of the movement contemplated by the tariff or another event that terminates the shipment for billing purposes. As an example of this category, petitioners note the case of freight shipped to a processing plant, then resh-ipped after processing and within a fixed period of time to another destination. *See* Brief of the Petitioning Railroads at 27 n. 47. In transit tariff cases, courts have held that the statute of limitations runs from the date of the event that determines which of several potentially applicable rates in fact will cover the complete transportation. *See, e.g., Arkansas Oak Flooring Co. v. Louisiana & Ark. Ry.*, 166 F.2d 98, 101–02 (5th Cir.), *cert. denied,* 334 U.S. 828, 68 S.Ct. 1338, 92 L.Ed. 1756 (1948); *Chicago & N.W. R.R. v. Connor Lumber & Land Co.*, 212 F.2d 712, 718 (7th Cir. 1954); *Bethlehem Steel Co. v. Consolidated Rail Corp.*, 515 F.Supp. 472, 473 (E.D. Pa.1981).

The Commission acknowledged that the transit tariff cases "are not directly on point here," for in those cases "shippers could not sue on the date of delivery to a point in transit, because the applicable rates were not then ascertainable," while "here Newell [and, similarly, Pielet] knew what its rates were, believed that they were too high, and in fact did file a complaint." *Newell I, supra,* slip op. at 4. Nevertheless, the Commission apparently took these cases to express a more general principle: "an agency must be given the latitude to hear complaints when justice so requires." Brief for the Respondents at 17.

In *Newell I,* and by reference in this case, the Commission inquired "whether a limitations bar can be postponed, on the ground that the cause of action can be found not to have accrued, when there are substantial legal doubts as to whether a suit could be successfully maintained on the cause of action at issue." *Newell I, supra,* slip op. at 4. The ICC thus appar-

---

1. The three year limitation of 49 U.S.C. § 11706(b) applies to claims for overcharges brought under 49 U.S.C. § 11705(b)(1). The two year limitation of 49 U.S.C. § 11706(c)(1) applies to claims for damages (often termed reparations) brought under 49 U.S.C. § 11705(b)(2). The ALJ in this case thought section 204(e) claims carried no fixed limitation, alternately that the three year statute governed; as to the latter, he reasoned that rates above the statutory level are not lawfully on file, so the amounts sought by Pielet constitute overcharges. The Commission selected the two year period on the ground that Pielet sought to show the charges it paid violated 204(e), not that they exceeded published rates. Because the ICC's selection of the two year limitation was unnecessary to, and did not advance, its decision holding Pielet's entire complaint timely, and because Pielet has not had an opportunity for review of this matter, we are remanding this aspect of the case, and we intimate no view on its proper resolution.

ently meant to consider whether large uncertainty as to the existence of a particular claim constitutes sufficient cause to stop the clock until the uncertainty is resolved (through litigation by others) in the potential claimant's favor. The label for such an inquiry that comes most readily to mind is "equitable tolling." Unfortunately, rather than turning to that doctrine for enlightenment, the Commission decided that prospectivity analysis was the line to pursue. If *Newell–Reopening* met the criteria for prospective application of a judicial decision enunciated in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 354–55, 30 L.Ed.2d 296 (1971),[2] the ICC somehow came to believe the statute of limitations bar pleaded by the railroads in answer to aging ASR claims would be overcome.

The Commission thus slipped into an analytical morass. Assuming for the moment what we will shortly reject—that *Newell–Reopening* constituted so dramatic a change in ICC case law as to warrant prospective application only—the Commission wholly misconceived the implications of prospectivity. Prospective application of *Newell–Reopening* would have benefited railroads, not shippers. It would have meant that ASR shippers could gain rate reductions and refunds for timely filed claims only on shipments delivered *after* July 10, 1986.

In fact, what the Commission did under the misnomer "prospective application of *Newell–Reopening*" was to apply that decision retroactively and, to boot, under the guise of advancing the accrual date, lift the statute of limitations. Straightforward retroactive application of *Newell–Reopening* would have imposed liability on the railroads for all but *only* those pending ASR claims based on shipments delivered within two years of the complaint (assuming 49 U.S.C. § 11706(c)(1) sets the governing limitations period). The Commission sought to go beyond this altogether standard retroactive imposition of liability and impose liability on the railroads for all pending ASR

claims *regardless* of the shipment delivery date.

In thus effectively *extending* the retroactive thrust of its decision, the Commission stumbled into error. The Commission's initial step—applying *Newell–Reopening* against the railroads retroactively—was entirely unproblematic. The history of individualized ASR rate complaints, as we have outlined above, is a tale of confusion and constant litigation, not one of dramatic volte-face or unforeshadowed change. Even the Commission acknowledges that the July 1986 holding in *Newell–Reopening* "may not have been entirely unexpected." *Newell I, supra,* slip op. at 5. As early as October 1981, when the ICC ordered territorially-averaged reductions and refunds under section 204(e), the Commission observed that "should a shipper of nonferrous recyclables believe that his particular rate still exceeds the permissible level, he may file a complaint with the Commission." *1981 Decision,* 365 I.C.C. at 307 (emphasis added). In defending its *1983 Decision* to allow both territorially-averaged and individualized reductions on the same rate, the Commission argued before this court, in *Norfolk & Western,* that the above-quoted passage from the *1981 Decision* had put shippers and rail carriers on notice that section 204(e) countenanced dual reductions. We rejected this argument, finding the sentence in the *1981 Decision* too "cryptic" to support the Commission's notice argument as to dual reductions, 768 F.2d at 381; but we recognized that the passage could support a Commission decision "order[ing] refunds on *either* an average *or* an individual basis, [but not] ... *both....*" *Id.* at 379 n. 6 (emphasis in original).

Following our *Norfolk & Western* decision, rail carriers, shippers, and the ICC litigated over the permissibility of individualized ASR reductions; ultimately, in *Newell–Reopening,* the shippers won that fray.

---

**2.** If prospectivity analysis had been the correct track to follow in this case, the Commission should have used *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380 (D.C.Cir.

1972), as its guide. *See Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074, 1081 (D.C.Cir.1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

This period of one year was hardly more than the denouement of an unfolding saga, and it by no means concluded with an "abrupt departure from well established practice...." *See Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972).

Underscoring the shippers' anticipation of the *Newell–Reopening* decision, Pielet itself filed the individualized ASR rate reduction claims at stake in this case *more than two years before* the Commission decided *Newell–Reopening.* Pielet was not the first shipper to file such claims, *see, e.g., Huron Valley Steel Co. v. Norfolk & W. Ry.*, No. 37668S, slip op. at 1 (I.C.C. Mar. 29, 1985) (complaint filed Mar. 17, 1981); *Newell Recycling Co. v. Norfolk S. Corp.*, No. 39647, slip op. at 2 (I.C.C. June 18, 1987) (informal complaint filed Dec. 27, 1982); *Newell Enters., Inc. v. Atchison, T. & S.F. Ry.*, No. 39669, slip op. at 1 (I.C.C. Oct. 19, 1984) (informal complaint filed Dec. 29, 1982); and in the months immediately before and after Pielet's filing, ALJs had already begun to render initial decisions awarding refunds to ASR shippers. *See, e.g., Huron Valley Steel Co., supra* (ALJ decision served Sept. 21, 1983); *Newell Recycling Co. v. Norfolk S. Corp., supra* (ALJ decision served July 10, 1984); *Newell Enters., Inc. v. Atchison, T. & S.F. Ry., supra* (ALJ decision served Oct. 24, 1984). Numerous additional ALJ decisions were rendered in 1985, still before the *Newell–Reopening* decision. *See, e.g., Pielet Bros. Trading Co. v. Chicago & N.W. Transp. Co.*, No. 39756 (I.C.C. Jan. 18, 1985) (ALJ decision); *Huron Valley Steel Co. v. Seaboard Sys. R.R.*, No. 39886 (I.C.C. Aug. 22, 1985) (ALJ decision). In addition, there was one Review Board decision, *see Huron Valley Steel Co., supra* (Rev. Bd. decision served Mar. 30, 1984), and even one decision by the Commission itself. *See id.* (decision served Apr. 15, 1985).

Circumstances such as these are the stuff that adjudications are made of: the law is unclear; opposing parties mount reasonable arguments on both sides; the adjudicator says what the law is. In such circumstances, "the general rule that judicial [or administrative] precedents apply not only prospectively but to all cases pending at the time they are decided," *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 423 (D.C.Cir.1987), prevails. *See also Clark–Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C.Cir.1987) (en banc) ("The general principle is that when as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it."), *cert. denied*, —— U.S. ——, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

The Commission here stepped boldly beyond run-of-the-mine retroactive application of its *Newell–Reopening* decision. By advancing the accrual date of ASR claims, it effectively set aside the statute of limitations pro tanto. This displacement of the statute was as extraordinary as it was unwarranted. We find no basis for it. The transit tariff cases indicate only a very limited, sensible, easily contained exception to, or qualification of, the subsection 11706(g) time of accrual rule. As already noted, the Commission itself recognized that the transit tariff cases do not carry heavy weight here because Pielet, unlike a shipper subject to a transit tariff, knew what its rates were upon the date of delivery.[3] Intervenor Pielet identified the proper rubric for what the Commission sought to achieve—equitable tolling of the statute of limitations. But this case, as we next

---

**3.** Similarly, the Commission's reliance on *Container Corp. of America v. Admiral Merchants Motor Freight, Inc.*, 489 F.2d 825 (7th Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1581, 39 L.Ed.2d 882 (1974), is misplaced. In that case the court interpreted the limiting phrase "within one year from the date of the [Commission's] order [for the payment of money]," in 49 U.S.C. App. § 16(3)(f) (the predecessor of 49 U.S.C. § 11706(e)) to mean one year from "the date on which the litigation prosecuted by the carriers to obtain judicial review of the Commission's order was completed." 489 F.2d at 828. Here, Congress has provided a precise definition in subsection 11706(g) for the limiting phrase "after the claim accrues." We have no authority to rework Congress' highly specific instruction.

explain, does not fit that mold.[4]

At the outset, the parties disagree over the importance of determining whether the limitations provisions of section 11706 are "jurisdictional," *i.e.*, mandatory, hence non-waivable. The Commission denigrates such "conclusion-reporting labels" as anachronistic, *see* Brief for the Respondents at 13 n. 10; petitioners press precedent supporting characterization of the section 11706 limitation prescriptions as "jurisdictional," and the auxiliary rule that such prescriptions are not subject to equitable tolling. In *Midstate Horticultural Co. v. Pennsylvania R.R.*, 320 U.S. 356, 364, 64 S.Ct. 128, 132, 88 L.Ed. 96 (1943), the Supreme Court observed that 49 U.S.C.App. § 16(3) of the Interstate Commerce Act—the predecessor of section 11706—"goes to the Commission's jurisdiction, so that . . . it has no power to act when the time has expired. . . ." *See also Axinn & Sons Lumber Co. v. Long Island R.R.*, 466 F.Supp. 993, 1000 (E.D.N.Y.1978) (section 16(3) "does not provide the ordinary statutory time bar against the enforcement of an existing right, but instead creates a right and sets the date of its extinction"). We have very recently referred to the continuing proclivity of courts to type statutes of limitations as "jurisdictional," and therefore unyielding, or "non-jurisdictional," therefore supple—open to waiver, estoppel, or equitable tolling arguments. *Mondy v.*

*Secretary of the Army*, 845 F.2d 1051, 1054 (D.C.Cir.1988). *See also Hardin v. City Title & Escrow Co*, 797 F.2d 1037, 1041 (D.C.Cir.1986) ("where . . . a time limitation is jurisdictional, the doctrine of equitable tolling does not apply"); *cf. Channel One Sys., Inc. v. FCC*, 848 F.2d 1305, 1306 (D.C.Cir.1988) (time limitations for filing FCC petitions for review are "a jurisdictional prerequisite") (per curiam).

The very existence of the transit tariff exception to, or qualification of, subsection 11706(g), however, somewhat weakens the dictum in *Midstate Horticultural* concerning the jurisdictional nature of the 11706 limitation provisions. Similarly, placement of section 11706 in chapter 117 of the Act, entitled "Enforcement: Investigations, Rights, and Remedies" rather than in chapter 105, entitled "Jurisdiction," cuts against petitioners' argument. *Cf. Hardin*, 797 F.2d at 1039–40 (comparing the placement of section 16 of the Real Estate Settlement Procedures Act in that statute's "jurisdiction" section with the placement of section 15b of Title 15 in that statute's "statute of limitations" section). To resolve this case, fortunately, we need not decide whether any or all the limitation prescriptions in section 11706 are properly classified "jurisdictional"; even if the provisions, including the definition of "accrue" in subsection 11706(g), were subject to the equitable toll-

---

4. In *Newell I, supra,* slip op. at 6, n. 6, the Commission made a passing reference to "the concept of equitable tolling of the statute of limitations." Besides that passing reference to equitable tolling, the ICC also noted, in the alternative, that "even were we to conclude that the cause of action accrued before 1986, [*Norfolk & Western*] would not permit us to find that it accrued before the July 1983 decisions." *Newell I, supra,* slip op. at 5 n. 6, citing *Norfolk & Western,* 768 F.2d at 380 ("In truth, this new method of *combined* territorial average and individual rate reductions represents a break with the Commission's practice as described in *NARI III* and the *1981 Decision.* The unfairness [*to the railroads*] of this break is patent.") (emphasis added); *id.* at 381 (the "cryptic" sentence in the *1981 Decision* did not "fairly put [the railroads] on notice"). This fallback position, much emphasized by ICC counsel in their brief and at oral argument, is equally untenable.

Again, the Commission has inverted the concept of prospectivity. If the *1983 Decision* did

in fact represent a sharp break with the Commission's treatment of individual rate reductions *not previously reduced* by a territorial average, then it might be unfair to the railroads to permit any individual claims based on shipments delivered before July 1983. It would only aggravate that unfairness to permit claims based on shipments delivered more than two years prior to July 1983 (again, assuming two years is the applicable period of limitation). But we do not read *Norfolk & Western* to say any more than that the dual reductions disapproved in that case represented a sharp break from past ICC practice. As we have already observed, *Norfolk & Western* did not rule on claims such as these, where no prior territorial average rate reduction occurred; indeed, *Norfolk & Western's* only observation as to such claims was to recognize the Commission's authority to permit them. *See Norfolk & Western,* 768 F.2d at 379 n. 6.

ing doctrine, fairness would not call for application of the doctrine here.

As we noted in *Mondy, supra,* at 1057, the Supreme Court has suggested that courts may permit tolling where "a claimant has received inadequate notice, ... where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon, ... where the court has led the plaintiff to believe that she had done everything required of her, ... [or] where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction." *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984) (per curiam) (citations omitted). We do not think the 1981–1986 confusion and litigation over individualized ASR complaints even remotely indicated that ASR shippers lacked notice that they had potential individual refund claims; nor is it possible that *Norfolk & Western,* decided in 1985, could have misled Pielet concerning the claim it filed in 1984. Similarly, the railroads' zealous but ultimately unsuccessful attempts to convince the ICC that *Norfolk & Western* precluded individualized ASR complaints in no way constituted "affirmative misconduct" that lulled Pielet into inaction until June 29, 1984. In sum, the "substantial legal doubts," *Newell I, supra,* slip op. at 4, that existed for both ASR shippers and carriers did not create any significant degree of unfairness much less the high degree of unfairness necessary for application of the equitable tolling doctrine.

### CONCLUSION

No equitable grounds warrant tolling the statute of limitations prescriptions of 49 U.S.C. § 11706 by advancing the date of accrual for ASR rate reductions and refund claims. Shipper Pielet's claims accrued on the dates shipments were delivered, as subsection 11706(g) says. To hold that accrual is deferred pending clarification that the individual ASR rate reduction and refund claims had a viable legal basis would severely erode the principle of prompt complaint underlying statutes of limitations.

The petition for review is therefore granted, the order of the Commission is vacated, and the case is remanded for a definitive determination of the proper prescription period.

*It is so ordered.*